# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| YACCOV COHEN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 4:15-CV-01756 JAR |
| | ) |
| OCEAN ESTER DEBORA COHEN, | ) |
| | ) |
| Respondent. | ) |
| | ) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

This action has been brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 22514 (the "Hague Convention"). The Hague Convention seeks to "protect children internationally from the harmful effects of their wrongful removal or retention" caused either by the removal of a child from the state of its habitual residence or the refusal to return a child to the state of its habitual residence. Hague Convention Preamble; see Barzilay v. Barzilay, 536 F.3d 844, 846 (8th Cir. 2008). The principal objectives of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1; see also Silverman v. Silverman, 338 F.3d 886, 897 (8th Cir. 2003). The Hague Convention is implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610 (1988). Chafin v. Chafin, 133 S. Ct. 1017, 1021 (2013). See also Abbott v. Abbott, 560 U.S. 1, 9 (2010); Barzilay, 536 F.3d at 846.

I. PROCEDURAL BACKGROUND

Petitioner Yaccov Cohen ("Father") filed his Complaint for Return of Child on November 25, 2015. (Doc. No. 1) On November 30, 2015, the Court issued an Order to Show Cause regarding the Complaint and set the matter for hearing on December 9, 2015. (Doc. No. 4) Respondent Ocean Ester Debora Cohen ("Mother") filed her answer to the Complaint on December 8, 2015. (Doc. No. 8) Father appeared for the show cause hearing through counsel; Mother appeared in person with counsel and the child named in the Complaint, O.N.C. Because the parties wished to conduct discovery, the Court ordered them to file a joint proposed scheduling plan by December 14, 2015. (Doc. No. 11) Upon receipt of the parties' joint proposed scheduling plan (Doc. No. 12), the Court adopted the plan submitted by the parties and issued a Case Management Order assigning the case to Track 1 (Expedited). An evidentiary hearing on Father's complaint was set for March 1, 2016. (Doc. No. 13) On February 18, 2016, the Court held a pre-trial conference on the record. Because Father resides in Israel and speaks limited English, counsel agreed that his testimony at the March hearing could be by telephone with the assistance of a Hebrew interpreter. (Doc. No. 26) The parties filed their trial briefs on February 26, 2016. (Doc. Nos. 35, 37)

An evidentiary hearing was held on March 1, 2016. Father appeared by telephone from Israel with the assistance of a Hebrew interpreter located in California; Mother appeared in person and with counsel. The Court heard arguments from both sides and admitted certain exhibits from Father and Mother into evidence. The hearing was extremely challenging and took several hours. On a number of occasions the Court lost the telephone connection, either with Father in Israel, or with the interpreter in California. At times the connection was not very good. It was difficult to get through Father's testimony, and counsel for both sides worked

cooperatively with each other to get the case submitted. Following the hearing, the parties were granted sixty days to submit proposed findings of fact and conclusions of law. (Doc. No. 41) Both sides filed their submissions on May 2, 2016. (Doc. Nos. 43, 44)

On June 8, 2016, Father moved for leave to file supplemental evidence in the form of an affidavit in which he elaborates on the process he undertook with the U.S. State Department to obtain pro bono legal representation in this case. (Doc. No. 45) Father asserts this evidence is relevant to demonstrate that he acted as expeditiously as he could to file his claim under the Hague Convention within one year of Mother's allegedly wrongful retention of O.N.C. Mother objects and moves to strike Father's affidavit on the grounds that he did not obtain leave of court to file any post-trial exhibits and that the time for submission of exhibits has therefore passed. Mother also argues the evidence is not relevant to the issues in this case. (Doc. No. 46) Father did not file a response to Mother's objection. Given the difficulties associated with Father testifying telephonically through the use of an interpreter, both on deposition and at the hearing, the Court finds it is not unreasonable to grant Father leave to supplement his testimony with an affidavit. Moreover, Father's affidavit is relevant to Mother's argument, discussed below, that he failed to commence these proceedings in a timely manner. The Court has carefully considered all of the evidence submitted and the parties' proposed findings of fact and conclusions of law. The matter is now ready for disposition.

**II.    FINDINGS OF FACT**

Father is an Israeli citizen and currently resides in Israel. Mother is a citizen of both the United States and Israel and currently resides in St. Louis, Missouri. The parties were married in Israel on November 4, 2008. They are the parents of a son, O.N.C., born December 6, 2009 in Israel. O.N.C. is also a citizen of the United States and Israel.

Father has an extensive criminal record in Israel with periods of confinement. Over the years he has accumulated substantial debt, including criminal fines, penalties and restitution payments. This has resulted in a Stay of Exit Order placed on his visa which prohibits him from leaving Israel.

In 2010, when O.N.C. was six months old, Father served eleven months of an eighteen month sentence of imprisonment for assault and using a vehicle without permission. During that time, Mother and O.N.C. moved in with her parents. After his release on six months house arrest, Father and Mother lived together with O.N.C. in her parents' apartment.

Shortly thereafter, the parties began discussing relocating to the U.S. Two of Mother's brothers, Noach and David Palatnik, were already living in St. Louis; a third brother, Yitzchak Palatnik, emigrated later. At that time, Noach was buying and "flipping" real estate and thought this work would be something Father could do and that a move to America would be a good opportunity for him. Although the parties disagree as to whose idea it was initially, they both testified that their plan was for Mother to move to the U.S. with O.N.C., find a place to live, enroll O.N.C. in school, and work to help Father pay off the debts which were preventing him from leaving Israel. Father would join them once his debts were paid off and they would live together in St. Louis.

According to Mother, they decided to move because their financial situation was difficult and they did not see a future for themselves and their son in Israel. Mother testified she told all her friends she was leaving Israel "basically for good except for visitations for holidays." It was Father's testimony that their intention was to come and live in the United States for three to five years to save enough money to buy a house in Israel.

4

With the agreement of Father, Mother and O.N.C. traveled to St. Louis, Missouri on December 3, 2012. At that time O.N.C. was three years old. Mother began working at an early childhood center with a focus on Jewish education. She found O.N.C. a pediatrician, enrolled him in a full-time educational program, and made arrangements for him to receive speech therapy services through the St. Louis Special School District. She bought a car, registered it, got a Missouri driver's license, and paid taxes. Mother and O.N.C. initially lived with her brother Noach, until they moved into a rented apartment of their own. At the time of the hearing, Mother was working for her brother David.

Father was in constant communication with Mother and O.N.C., and once she was settled and working, Mother began sending money to Father. She also borrowed $6,000 from her brother Noach to help Father pay off his debts. Despite these efforts, however, Father made little to no progress in reducing the amount of his debts, and the exit stay remained on his visa.

Over the next two years, Mother and O.N.C. returned to Israel twice, each time on round-trip tickets. Their first visit was from May 22, 2013 to June 11, 2013. Mother, Father and O.N.C. stayed with Mother's parents at their apartment. At this point in time, the parties were still discussing their plan for Father to join them in the U.S. The obstacle to Father joining them continued to be his inability to pay off his debts.

Mother and O.N.C. traveled to Israel a second time from April 8, 2014 to April 24, 2014. The parties were still planning for Father to come to the U.S., but Mother's feelings about their relationship had become unclear and the marriage was deteriorating. Father became concerned that Mother would not return again and sought out a lawyer, Yaccov Halpern, to draft a "travel agreement" requiring her to return to Israel with O.N.C. if he was unable to join them in six months' time. The parties presented differing accounts of the circumstances surrounding the

5

drafting and execution of this agreement. It was Mother's testimony that she felt she had no option but to sign the agreement, presented to her just hours before she and O.N.C. were scheduled to depart, because she was afraid that Father would not otherwise allow her to return to the United States with O.N.C. She signed it after a clause was added requiring Father to "stay away from crime and not get into trouble." If Father breached the conditions of this clause, then Mother was not obligated to return under the terms of the agreement. At the hearing, Father acknowledged he was not seeking to enforce the "travel agreement" and was offering it merely as evidence of their intent.

It was Mother's testimony that she intended for some time to reside in the United States. Once she was back in St. Louis, Mother filed for divorce in July 2014. In August 2014, Mother received a telephone call from Father telling her he had been arrested, jailed, and then placed on house arrest at his mother's residence in Dimona, Israel. Father testified that he learned of the divorce proceedings in early September 2014 after receiving an advertisement dated August 28, 2014 from a local St. Louis law firm. Father disputes that he was served with the Petition for Dissolution of Marriage; however, the record indicates service on Father at the address in Dimona on November 13, 2014.

According to his affidavit, on September 8, 2014, Father applied to the Israeli Ministry of Justice with a request to open a file to return O.N.C. to Israel. He filed a Request Pursuant to the Hague Convention with the Israeli Ministry of Justice seeking the international return of O.N.C. on January 22, 2015. By letter dated January 23, 2015, the U.S. State Department acknowledged receipt of Father's Hague Convention application and requested additional documentation from him including, *inter alia*, a legal assistance request form to determine his eligibility for pro bono legal services.

On March 13, 2015, the Circuit Court of St. Louis County, Missouri entered a Judgment of Dissolution of Marriage, granting Mother sole legal and physical custody of O.N.C. with supervised visitation to Father under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA").

On April 29, 2015, Father completed the legal assistance request form and the Israeli Ministry of Justice submitted it together with the additional documentation requested to the U.S. State Department that same day.

On June 14, 2015, Father was notified that the State Department had located Mother and O.N.C. in St. Louis. Between June 14, 2015 and October 2015, the State Department contacted a number of attorneys on Father's behalf. He signed an engagement letter with counsel on November 17, 2015 and filed his complaint in this Court for issuance of a show cause order under the Hague Convention on November 25, 2015. Father contends that Mother has wrongfully retained O.N.C. in the United States in violation of his custody rights under Israeli law. Father asserts that Israel was O.N.C.'s habitual residence prior to retention, and that the Court must order O.N.C.'s return consistent with their shared intent as evidenced by the parties' April 24, 2014 travel agreement. Mother contends, however, that the move from Israel to the United States effected a change in O.N.C.'s habitual residence such that there has been no wrongful retention in this case.

### III. CONCLUSIONS OF LAW

To establish a prima facie case for return under the Convention, a petitioner must show, by a preponderance of the evidence, that: (1) prior to removal or wrongful retention, the child was habitually resident in one Hague signatory country and then wrongfully removed to or

retained in a different Hague signatory country[1]; (2) the removal or retention was in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the removal or wrongful retention. Hague Convention, art. 3; 42 U.S.C. § 11603(e); Barzilay, 536 F.3d at 847; Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995).

"[E]very Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision." Redmond v. Redmond, 724 F.3d 729, 742 (7th Cir. 2013). The Convention does not define "habitual residence" but directs courts to determine the habitual residence of the child at the point in time "immediately before the removal or retention." Hague Convention art. 3(a). The date of retention has not been clearly established in this case. Although Father alleges the wrongful retention occurred in October 2014, when Mother did not return to Israel with O.N.C. as agreed under the terms of their "travel agreement," he also alleges that he became aware of the divorce and child custody proceedings in St. Louis County in early September 2014. Father was arguably on notice at that time that Mother intended to remain in the United States with O.N.C.[2] In any event, this

---

[1] The United States and Israel are both signatories to the Hague Convention. See U.S. Hague Convention Treaty Partners, www.travel.state.gov (last visited Aug. 11, 2016).

[2] Mother argues that even if the Court determines that O.N.C.'s habitual residence is Israel, under either scenario the action was commenced more than one year from the alleged wrongful retention, and the Court is not required to return O.N.C. if he is now settled in his new environment. Father argues the "well-settled" affirmative defense set forth in Article 12 of the Convention does not apply because he began the process of bringing a claim under the Convention well within a year of wrongful retention by filing his request with the Israeli Ministry of Justice on January 22, 2015. However, U.S. courts have interpreted "commencement of proceedings" in Article 12 to mean that an action must be filed in court. See 22 U.S.C. § 9003(f)(3); Muhlenkamp v. Blizzard, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. 2007) (the one-year period is measured from when the petition was filed in court); Belay v. Getachew, 272 F. Supp. 2d 553, 561 (D. Md. 2003) (the filing of the petition in court commences the judicial proceedings); Wojcik v. Wojcik, 959 F. Supp. 413, 420 (E.D. Mich. 1997). But see In re A.V.P.G., 251 S.W.3d 117, 124-25 (Tex. Ct. App. 2008) (holding that the well-settled defense did not apply because petitioner filed a request for return with the National Center for Missing and Exploited Children, an "administrative body" for purposes of stopping the one-year clock). The Court need not address the applicability of the "well-settled" affirmative defense, or whether Mother waived it by failing to plead it in her answer to Father's

case turns on whether O.N.C. was still a habitual resident of Israel, despite having lived in the United States for the two years preceding the alleged retention, or whether his habitual residence changed to the United States when he traveled there with Mother in December 2012 and remained there (with the exception of two 2 ½ week trips to Israel).

No single factor is necessarily dispositive of the habitual residence inquiry; instead, "[t]he determination of habitual residence…is a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case." Redmond, 724 F.3d at 732. In the Eighth Circuit, factors relevant to the determination of habitual residence include the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country." Stern v. Stern, 639 F.3d 449, 452 (8th Cir. 2011) (citing Barzilay, 600 F.3d at 918). Habitual residence is determined by examining "past experience, not future intentions." Sorenson v. Sorenson, 559 F.3d 871, 873 (8th Cir. 2009) (quoting Silverman, 338 F.3d at 898); Nunez–Escudero v. Tice–Menley, 58 F.3d 374, 379 (8th Cir. 1995).

"The 'settled purpose' of a family's move to a new country is a central element of the habitual residence inquiry." Barzilay, 600 F.3d at 918 (citing Silverman, 338 F.3d at 898). However, "settled purpose "need not be to stay in a … location forever. Id. What is crucial is that the purpose "have a 'sufficient degree of continuity to be properly described as settled.'" Id. Settled purpose must be from the child's perspective, although parental intent is also considered. Id.

---

complaint because, as discussed herein, Father has failed to establish a prima facie case for return under the Convention in the first instance.

In Barzilay, for example, father, a resident and citizen of Israel, filed a petition under the Hague Convention seeking an order compelling his former wife, an Israeli citizen living in Missouri, to comply with settlement agreements requiring her to move to Israel with the couple's three children. Two of the three children had lived their entire lives in Missouri; the oldest child had lived there for five years – half of her life. There was no indication that the children had spent any significant amount of time in another country. The children of school age had been attending school in the United States; none of them had gone to school in Israel. Based on these facts, the Eighth Circuit concluded that from the children's perspective, the settled purpose of the family's residence in Missouri was to remain there permanently. 600 F.3d at 919.

Similarly in Sorenson, the Eighth Circuit held that Australia was the habitual residence of a child who remained in Australia with her mother after father returned to the United States. The child was five years old and had been living in Australia for three years; she even spoke with an Australian accent. All of her friends lived in Australia, and she was enrolled in preschool. In short, the child had spent the overwhelming majority of her life in Australia, and the majority of her connections were to Australia. In addition, the parents had shared the intent to live in Australia for an indefinite period of time, but at a minimum for three years. Based on these facts, the Eighth Circuit held that the child had been in Australia long enough to have a "sufficient degree of continuity to be properly described as settled." 559 F.3d at 874.

Here, O.N.C. has experienced a clear change in geography and a substantial amount of time, over three years, has passed since the move to the United States. Sorenson, 559 F.3d at 873-74. The evidence demonstrates that both Mother and Father decided to have O.N.C. reside in the U.S. The parties disagree on whether the relocation was intended to be permanent, but again, settled purpose need not be to stay forever so long as there is a "sufficient degree of continuity to

10

be properly described as settled." Barzilay, 600 F.3d at 918. Although O.N.C. resided in Israel for the first three years of his life, the last three years and eight months - more than half his life - have been spent in St. Louis, Missouri. At age 6, O.N.C. is "not only cognizant of his … surroundings, but also of an age at which [he] is able to develop a certain routine and acquire a sense of environmental normalcy." Whiting v. Krassner, 391 F.3d 540, 549 (3d Cir. 2004) (recognizing that a four-year old "is not only aware of those around him but is able to form meaningful connections with the people and places he encounters each day."). O.N.C. has been enrolled in elementary school, receives speech therapy services through the St. Louis Special School District, and is doing well. He speaks primarily English, socializes with friends, and is involved in activities such as martial arts and swimming through the Jewish Community Center. There is little evidence in the record concerning O.N.C.'s connections with Israel, while it appears that O.N.C. has considerable connections with his current environment. He enjoys a close relationship with his three maternal uncles, and he and Mother have found a community of Israeli-Americans and Israeli expats with whom they socialize. Based on these facts, the Court concludes that as of October 2014, O.N.C. had been in Missouri long enough to have a "sufficient degree of continuity to be properly described as settled" from his perspective. Sorenson, 559 F.3d at 874.

The Eighth Circuit has instructed that parental intent, while not dispositive, is also taken into account in the habitual residence determination.[3] See Stern, 639 F.3d at 452; Barzilay, 600

---

[3] The Court acknowledges a split among the circuits as to the role or significance of parental intent in resolving habitual-residence questions. Redmond v. Redmond, 724 F.3d 729, 744-47 (7th Cir. 2013). Circuits following the Ninth Circuit decision in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), place the primary focus upon parental intent. See, e.g., Gitter v. Gitter, 396 F.3d 124 (2d Cir. 2005); Maxwell v. Maxwell, 588 F.3d 245 (4th Cir. 2009); Koch v. Koch, 450 F.3d 703 (7th Cir. 2006). Under this approach, courts ask first whether the parents demonstrate a shared intention to abandon the former habitual residence, id. at 1075, and second whether there has been a change in geography for an "appreciable period of time" that is "sufficient for acclimatization," id. at 1078, 1067. Other Circuits

F.3d at 920; Silverman, 338 F.3d at 899. After carefully weighing the evidence and assessing the parties' credibility, the Court concludes that the parties intended to relocate to the United States and establish O.N.C.'s residence here. Indeed, prior to the move, the parties applied together for approval of O.N.C.'s naturalization application for United States citizenship, something Father testified was very important to him for his son. Father also testified that Mother's brothers talked to him about coming to the U.S. to work with them because of his knowledge in the construction business. It was understood by the parties that Father would not be able to leave Israel until his debts were paid off and the stay order on his visa was lifted. Until then, their intent was always for Mother and O.N.C. to go ahead of Father and settle in the United States. The best evidence of this intent is the actions taken by the parties. Mother and O.N.C. traveled to the U.S. despite the known issues surrounding Father's visa. Mother secured full-time employment, enrolled O.N.C. in school, bought and registered a car, applied for a Missouri driver's license, and paid taxes. She eventually rented an apartment for them. All of these actions demonstrate that Mother was establishing a life here for the family, and for the next two years, the parties continued to act in furtherance of their plan. Mother was working and sending money to Father, and Mother believed Father was making an effort to pay off his debts. Not until April of 2014, when the marriage deteriorated, did Father claim the relocation had been intended to be temporary.

The Court has considered the "travel agreement" as potential evidence of the parties' intent; however, there is insufficient credible evidence in the record to support a conclusion that the parties mutually agreed to alter their intent. Moreover, habitual residence is determined by

---

focus on habitual residence from the child's perspective, downplaying parental intent. See, e.g., Robert v. Tesson, 507 F.3d 981 (6th Cir. 1993); Karkkainen v. Kovalchuk, 445 F.3d 280 (3d Cir. 2006). The Eighth Circuit has generally followed this approach. See, e.g., Stern, 639 F.3d at 452 ("[t]he child's perspective should be paramount in construing this Convention whose very purpose is to protect children by preventing their removal from the family and social environment in which [their lives have] developed.") (internal citations and quotation marks omitted).

examining "past experience, not future intentions." Sorenson, 559 F.3d at 873 (quoting Silverman, 338 F.3d at 898).

Having considered the factors relevant to the habitual residence inquiry in this case, the Court concludes that Father has failed to establish by a preponderance of the evidence that O.N.C.'s habitual residence is Israel. The change in geography, passage of time since the move to the United States, O.N.C.'s acclimatization to his current environment, the degree of settled purpose in his environment from his perspective, and the shared intent of the parties all point to the U.S. as O.N.C.'s habitual residence.

## IV. CONCLUSION

The availability of the return remedy depends on the child's habitual residence because the "retention of a child in the state of its habitual residence is not wrongful under the Convention." Barzilay, 600 F.3d at 916. Here, the Court concludes that the United States, not Israel, was O.N.C.'s habitual residence immediately before the retention. Thus, Mother's retention of O.N.C. in the United States in October 2014 was not wrongful within the meaning of Article 3 of the Convention. Without a wrongful retention, this Court has no authority to order O.N.C. to be returned to Israel. "If a child has not been moved from its habitual residence … relief under the Hague Convention must be denied without further inquiry into whether the petitioning parent's custody rights have been breached or whether the petitioning parent was actually exercising those rights at the relevant time." Redmond, 724 F.3d at 742. The Court recognizes the importance of Father's custody rights and maintaining regular contact with his son; however, these are not matters for the Court's consideration in a case for return under the Hague Convention.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Motion for Leave to File Supplement Evidence in the Form of an Affidavit [45] is **GRANTED**.

**IT IS FURTHER ORDERED** that Petitioner's Complaint for Return of Child [1] is **DENIED.**

A separate Judgment will accompany this Order.

Dated this 1st day of September, 2016.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**